UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBIN GONZALEZ,<br><br>            Plaintiff,<br><br>     v.<br><br>COUNTY OF YOLO; EDWARD G. PRIETO, an individual; and DOES 1 through 50, inclusive,<br><br>            Defendants. | No.  2:13-cv-01368-KJM-AC<br><br><br>ORDER |

Robin Gonzalez works for the Yolo County Sheriff's Department and alleges the Sheriff, Edward Prieto, sexually harassed her over several years. She brought this action against the County under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and against both the County and the Sheriff under the California Fair Employment and Housing Act (FEHA), California Civil Code § 12900 *et seq*. The County and Sheriff have jointly moved for summary judgment in two separate motions: first, seeking judicial estoppel of plaintiff's claims, Defs.' Renewed Mot. Summ J., ECF No. 37; Mem. P.&A. Renewed Mot. Summ. J. (Estoppel Mem.), ECF No. 37-1; and second, seeking summary judgment generally, Defs.' Mot. Summ J., ECF No. 36; Mem. P.&A. Mot. Summ. J. (Merits Mem.), ECF No. 36-2. The court held a hearing on January 30, 2015. Manolo Olaso appeared for Ms. Gonzalez, and John Whitesides and Cori Rae

Sarno appeared for the County and Sheriff Prieto.  After considering the parties' briefing and arguments at the hearing, closely reviewing the record of the case and carefully considering the law's application to the facts, the court GRANTS the motion for summary judgment on Gonzalez's substantive claims and DENIES the motion for judicial estoppel as moot.

The court addresses first the County's substantive motion for summary judgment.

I.   BACKGROUND

Most of the facts underlying Gonzalez's claim here are not disputed.  Although the defendants deny most of Gonzalez's allegations of harassment, they do not dispute them for purposes of this motion.  Merits Mem. 1–3 & n.1.

Gonzalez alleges Prieto began harassing her in 2002, the day she interviewed for a job at the Sheriff's Department.  UMF1 no. 1.  She remembers Prieto passing her in the hallway, calling her a "tall drink of water," and looking her up and down.  Gonzalez Decl. ¶ 3, ECF No. 38-2.  During her first assignment in courts and transportation, she saw Prieto about once a month for two years; during this time he hugged her to greet her.  Merits Mem. at 1; Gonzalez Dep. at 26:22–24, 27:19–28:13.  She began training for patrol in 2004, and Prieto continued to hug her and also kissed her on the cheek.  Merits Mem. at 1; Gonzalez Dep. at 42:22-43:15.  It was then she first believed Prieto's behavior was sexual harassment, but she did not file a claim.  UMF1 no. 21; Merits Mem. at 1.  Gonzalez agrees she never told Prieto his hugging made her uncomfortable.  UMF1 no. 41.

Gonzalez began working as a detective in 2006 and saw Prieto more often; she claims his harassment became more severe.  UMF1 no. 22.  Gonzalez recalls Prieto suggested he could be her "sugar daddy," Gonzalez Decl. ¶ 14, ECF No. 38-2; Gonzalez Dep. 81:18–24, complimented her weight loss, Gonzalez Decl. ¶ 15; Gonzalez Dep. 83:7–13, told her he was a "weak man" while looking her up and down, Gonzalez Decl. ¶ 14; Gonzalez Dep. 80: 25–81:15, pinched her sides, Gonzalez Decl. ¶ 15; Gonzalez Dep. 83:14–84:7, and told her she needed to wear more makeup, Gonzalez Decl. ¶ 8; Gonzalez Dep. 84:11–85:7.  Her coworkers teased her about him, for example by saying Prieto was coming to "molest" her and rub his "biff" on her.  Gonzalez Decl. ¶¶ 9–10.  She usually laughed in response to their teasing and returned sexual

banter with coworkers, UMF1 nos. 58–59, but their teasing bothered her, Gonzalez Dep. 71:24–72:24. Another supervisor offered to report Prieto's behavior, but Gonzalez says she declined in fear of Prieto's reputation for retaliation, Gonzalez Decl. ¶ 11, and in fear of making "waves." Gonzalez Dep. 76:15–77:5.

In June 2010 Gonzalez's detective assignment was ending. Gonzalez Dep. 208:5-8. She was happy to be returning to patrol. *Id.* at 208:9–20. Before she left, she alleges Prieto said, "Maybe for a blow job you can stay in investigation longer." UMF1 nos. 23, 38–40; Merits Mem. at 2; Gonzalez Dep. at 85:12–86:25. No one else heard or witnessed this comment, and Prieto denies he made it. UMF1 no. 40. The parties also disagree whether the comment was intended or understood as a joke. Gonzalez did not consider staying in detectives a "benefit," but she "knew he was serious." Gonzalez Dep. at 209:6–13. She maintains she did not believe it to be a joke despite telling others Prieto made the comment in a joking way. UMF1 nos. 38–39; Gonzalez Dep. Ex. 4, 91:24–93:3; Gonzalez Decl. ¶¶ 16–19. Gonzalez's supervisor reported Gonzalez told him Prieto had been joking, but Gonzalez denies saying so. UMF1 no. 38.

On June 17, 2010, Gonzalez complained about and reported Prieto's hugging, kissing, and sexual proposition. UMF1 nos. 33–34. This was the extent of her report. She did not describe any teasing by coworkers or other harassment and did not describe the hugs and kisses as sexual, *id.* nos. 44–45, 55; however, she thought about hiring an attorney and pursuing a civil claim, *id.* no. 23. Immediately after Gonzalez made her complaint she spoke with the director of human resources, Mindi Nunes. *Id.* no. 35. Nunes contacted Prieto and other possible witnesses and prepared a written report. *Id.* nos. 36–37. She asked Prieto not to make physical contact with Gonzalez and to keep any communications professional, and Prieto agreed. *Id.* no. 42. Nunes also told Gonzalez the County could not do anything more because Prieto was an elected official, and the County could not discipline him.[1] *Id.* no. 24. Gonzalez transferred to a

---

[1] Sheriff Prieto is an elected official, not an employee of Yolo County. UMF1 no. 28. Although elected officials are not "employees" within the definition of Title VII, *see* 42 U.S.C. § 2000e(f), Title VII imposes liability on employers, *id.* § 2000e-2(a), and its definition of "employer" includes agents, *see id.* § 2000e(b); *McCall v. Oregon*, No. 12-00465, 2013 WL 6196966, at *2 (D. Or. Nov. 27, 2013). Whether Prieto was an agent could at least be a triable question of fact. *See* Merits Opp'n 6–7 (arguing the County controls Prieto's budget, sets his

1    new assignment, and Prieto did not hug or kiss her again.  *Id.* no. 43.  Neither did her coworkers

2    tease her about Prieto again.  UMF1 no. 57.

3    After Gonzalez submitted her complaint in June 2010, she saw Prieto between

4    twenty and thirty times.  UMF1 no. 20.  In November 2010, Prieto touched her shoulder while she

5    was in a training class; Gonzalez remembers he "grabbed" and "massaged" her shoulder.  UMF1

6    no. 15; Gonzalez Dep. 114:18–115:23.  Prieto remembers he touched the shoulders or backs of

7    the chairs of both men and women deputies while he walked toward the front of the room and did

8    not single out Gonzalez.  Prieto Decl. ¶ 10, ECF no. 36-6.  Gonzalez reported the event to Nunes,

9    who in turn contacted the Sheriff, and he never touched her again.  UMF1 nos. 17–19, 50–51.[2]

---

salary, determines which services he may provide, and has power to contract out his services); *cf. Streit v. Cnty. Of L.A.*, 236 F.3d 552, 564 (9th Cir. 2001) (collecting cases to show sheriffs are liable as agents of a county for purposes of 42 U.S.C. § 1983).

[2] At the hearing Gonzalez's counsel asserted Prieto pinched her sides after 2010.  *See also* UMF1 no. 4 (denying the fact is undisputed, arguing Prieto's comments in 2011 and 2012 "were accompanied by pinching or staring").  Counsel referred the court to Gonzalez's deposition and declaration.  In her deposition, the following exchange occurred:

    Q.  And when did he comment about your weight?
    A.  Probably around 2009.
    Q.  What did he say?
    A.  That was the first time. And then after, in 2011.
        He just said, You look good. You've lost weight.'
        He's pinched my sides.
    Q.  He's pinched your sides?
    A.  Yes, he pinched my sides.
    Q.  How long? How long did that touching last?
    A.  Enough to do a pinch, so a couple of seconds.
    Q.  Was anyone else present when that happened?
    A.  It was in my office.
    . . .
    Q.  And that was the only weight loss comment prior to 2011?
    A.  Yes.

Gonzalez Dep. 83:14–25.  In a declaration submitted with her opposition to this motion, between two paragraphs describing events in 2009 and 2010, Gonzalez wrote Prieto "would pinch my sides and stare at my body," without reference to any particular date.  *See* Gonzalez Decl. ¶ 15, ECF No. 38-2.  Gonzalez has also agreed it was undisputed that, "After November 2010, the Sheriff never touched Plaintiff, in any manner again, even though she saw him another 20-30 times after that."  UMF1 no. 51.  In light of this agreement and the context of her deposition testimony and declaration, the court finds it is undisputed that all pinching or touching of any

4

Nevertheless, Gonzalez remembers that in 2011 and 2012, Prieto made more comments about her weight loss, told her she looked good, looked her up and down, and stared at her chest and hips as he had before. Gonzalez Decl. ¶¶ 21–22. Sheriff Prieto commented about her weight two times in 2012. *Id.* ¶ 22; Gonzalez Dep. at 117:10–118:23. Gonzalez agrees both that other employees also appropriately complimented her for losing weight and that her physical fitness was relevant to her duties as a sheriff's deputy, but she contends Prieto's manner and intonation rendered his words sexually harassing. UMF1 no. 9. She also describes how in October 2012 she spoke with other women coworkers, and learned Prieto had made sexist or sexually suggestive comments to them or touched them inappropriately. Gonzalez Decl. ¶ 23. The timeframe of this conduct is unclear. *See* Gonzalez Dep. 143:10–148:10. Gonzalez made no further report to HR because she believed it futile. UMF1 no. 26. She thought no one could do anything to stop him. *Id.* no. 25.

      Gonzalez felt ostracized and alone after her reports. *Id.* no. 67. Rooms quieted when she entered, and although coworkers were friendly and supportive in public and provided backup in the line of duty, in private she sensed their unease. *Id.* Prieto contends he has not personally taken any retaliatory action, but he called her claims meritless ("bullshit") in a management meeting in 2012. *Id.* no. 65; Gonzalez Decl. ¶ 24–25. Gonzalez also claims she was excluded from honor guard events in January and February 2013. Honor guard events are volunteer assignments for which deputies generally receive no extra pay or incentive. UMF1 no. 60. Honor guard members, including Gonzalez, sometimes miss events. *Id.* no. 61. In January 2013, she attended an honor guard event after her supervisor said she would receive overtime pay for her attendance, but was later allowed to use only "comp time" instead.[3] Gonzalez Dep. 149:11–151:23. She heard from her supervisor that he "kind of" got "in trouble" for letting her go. *Id.* at 150:15–23. In February 2013, Gonzalez was not invited to another honor

---

kind ceased after November 2010. As described below, however, this does not resolve the question of Prieto's alleged leering glances and comments about Gonzalez's weight.

[3] Receiving "comp time" rather than overtime pay meant she "got time and a half instead of actual money." Gonzalez Dep. 151:4–5. In other words, she "ended up instead getting time and a half of comp time," "time off," which she agreed was "more than the overtime." *Id.* at 151:15–23.

5

guard assignment, an assignment Prieto's daughter did attend.  Merits Mem. at 19; UMF1 no. 60; Gonzalez Dep. 140:16–142:9; Gonzalez Decl. ¶ 26.  Gonzalez agrees neither the Sheriff nor his daughter requested her absence, UMF no. 63, but contends the circumstances of her exclusion imply the Sheriff's retaliation, Gonzalez Decl. ¶¶ 26–27.  Gonzalez has attended other honor guard events since January and February 2013, and has attended other events with Prieto's daughter, who she agrees has acted professionally.  UMF1 no. 64.

Gonzalez filed a complaint with the EEOC and DFEH on January 14, 2013.[4] UMF1 no. 2.  She filed her judicial complaint in this action on July 9, 2013.  Compl., ECF No. 1.  She agrees Prieto's conduct in 2013 and 2014 has been appropriate.  UMF1 no. 19.  Her judicial complaint alleges three claims: (1) sexual harassment under Title VII; (2) sexual harassment under the FEHA; and (3) failure to prevent sexual harassment under the FEHA.  She seeks compensatory, general, special, and punitive damages, her costs, and her attorneys' fees.

The defendants argue Gonzalez's claims must fail because (1) neither her Title VII nor FEHA claim was timely; (2) the County cannot be held liable for the Sheriff's conduct because he is an elected official and not an employee; (3) the County undertook reasonable efforts to prevent and address sexual harassment, and Gonzalez unreasonably ignored its procedures meant to protect her; (4) the County had no notice of any hostile work environment created by her coworkers; (5) Gonzalez has not made out a prima facie case of retaliation; and (6) Gonzalez has not put forward evidence the County failed to prevent a violation of the FEHA.  After addressing the County's evidentiary objections and reviewing the legal standard appropriate for this motion, the court addresses each of these arguments in turn.

II.     EVIDENTIARY OBJECTIONS

The defendants have submitted a raft of detailed objections to the declaration Gonzalez attached to her opposition.  Defs.' Obj. Gonzalez Decl. (Evid. Obj.), ECF No. 42-2.  The majority of these objections protest the declaration's relevance, vagueness, foundation, and impropriety as containing legal conclusions.  In some instances they attack the declaration as

---

[4] She received a right to sue letter from the EEOC on June 10, 2013, and from the DFEH on January 14, 2013.  Compl. ¶¶ 11–12, ECF No. 1.

inadmissible hearsay or as an attempt to create a dispute of material fact by contradicting earlier testimony. Generally speaking, evidence presented in the context of a motion for summary judgment must be admissible.[5] *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). But a moving party serves neither its own interests nor the purposes of summary judgment by inundating the court with detailed evidentiary objections within two weeks of the hearing on its motion.[6] *Burch*, 433 F. Supp. 2d at 1118–19.

      First, the moving papers themselves—not separate tables of objections—are the correct mode of objection on relevance and similar grounds. *Id.* at 1119. Rule 56 expressly seeks out genuine disputes of material facts, not immaterial facts. If evidence is irrelevant, vague, or contains legal conclusions, a party seeking summary judgment should describe this irrelevance, vagueness, and conclusory unreliability directly as grounds for summary judgment in its favor. *See Celotex*, 477 U.S. at 323, 325 (requiring a movant "inform[] the district court of the basis for its motion" and show "there is an absence of evidence to support the nonmoving party's case"). Here, in contrast, the defendants' objections for irrelevance are often based on their position that Gonzalez's claims are untimely. *See, e.g.*, Evid. Obj. no. 1. The court overrules objections based

---

[5] In some previous orders the undersigned has applied a less nuanced review of evidentiary objections submitted by parties moving for summary judgment. *See, e.g.*, *Garcia v. Amerisource Bergen*, No. 09-3432, 2011 WL 2038552, at *3 (E.D. Cal. May 23, 2011) ("A court may consider only admissible evidence in ruling on a motion for summary judgment."). The Ninth Circuit has also at times adopted a similarly generalized rule. *See, e.g.*, *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988) ("It is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment."). The Ninth Circuit's decisions on this front are in fact not entirely consistent. *See Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1121 (E.D. Cal. 2006) (contrasting *Carmen v. S.F. Unified School Dist.*, 237 F.3d 1026, 1028–29 (9th Cir. 2001), and *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 778–80 (9th Cir. 2002)). As described below, in light of Rule 56's language and the higher courts' interpretation of that rule, *see, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Block v. City of L.A.*, 253 F.3d 410, 418–19 (9th Cir. 2001), the court ultimately has concluded admissibility objections call for a different analysis at summary judgment than at trial.

[6] Voluminous objections may be required in some circumstances and would raise no hackles if well-founded and carefully reasoned. But here, for example, defendants' attempt to exclude Gonzalez's assertion Prieto was "so brazen in his remarks" is not well-taken. *See* Evid. Obj. no. 1. Defendants' objections to Gonzalez's recitation of Prieto's statements as hearsay, are equally unavailing given that Prieto is without question a party opponent whose statements are excluded from the rule against hearsay. *See* Fed. R. Evid. 801(d)(2)(A).

on relevance, vagueness, and legal conclusions, evaluating these arguments instead in the context of Gonzalez's substantive claims.

Second, objections to form are often a poor fit for summary judgment. At this stage, the propriety of evidence depends not on its form, but on its content. *Celotex*, 477 U.S. at 324 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. . . . [Rule 56] permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves."); *see also Block*, 253 F.3d at 418–19 (9th Cir. 2001). Rule 56(e) uses the modal construction, "would be admissible," for a reason. In particular, hearsay objections are often premature at summary judgment when asserted by the moving party. Without a doubt, should the court grant a motion for summary judgment, it must do so on the basis of admissible evidence. *See, e.g.*, *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) ("Verdicts cannot rest on inadmissible evidence."). But a party opposing a motion for summary judgment seeks a trial, not a verdict, and it stands to reason that if evidence may probably be converted to admissible form for trial, it should not be excluded at summary judgment. *See Fraser*, 342 F.3d at 1036 (declining to exclude hearsay statements because in a different form the testimony could be admitted at trial); *Hatcher v. Cnty. of Alameda*, No. 09-1650, 2011 WL 1225790, at *3 (N.D. Cal. Mar. 31, 2011) (same). The defendants' objections to form and hearsay are overruled to the extent the evidence objected to on these grounds is discussed below.

Finally, the defendants point out that Gonzalez has not always consistently described Prieto's behavior or her responses to it. *See, e.g.*, Evid. Obj. no. 4. A plaintiff may not create a genuine dispute of fact by offering inconsistent testimony. *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). But this rule "does not automatically dispose of every case in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony." *Id.* at 266–67. To apply the rule, the district court must first make the factual determination the contradiction is actually a sham. *Id.* at 267. To trigger an exclusion, the inconsistency must be "clear and unambiguous." *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989,

8

998–99 (9th Cir. 2009). Certain inconsistencies do taint Gonzalez's declaration, and favorable exaggerations do not serve her well. *See, e.g.*, Evid. Obj. 8 (contrasting her deposition testimony that her supervisors knew she was "uncomfortable" with her declaration, describing her supervisors' knowledge she was "extremely uncomfortable"). But the testimonial inconsistencies at issue here are not so self-contradictory as to warrant exclusion. *See also, e.g.*, Evid. Obj. 4 (arguing for exclusion of Gonzalez's declaration that "I did not encourage Sheriff Prieto to hug me and did not extend my arms to him or initiate hugs" because she testified in her deposition that she sometimes returned a hug or rose to greet him.). Nevertheless, to avoid reliance on resourceful recollection in a studied, written declaration rather than more spontaneous deposition testimony, the court relies on Gonzalez's deposition testimony when it is relevant and inconsistent with her declaration.

III.   LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A trial court in receipt of a motion for summary judgment performs a "threshold inquiry" to decide "whether there is the need for a trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).[7] The judge does not make credibility determinations, weigh evidence, or decide what inferences are legitimate, but must decide more fundamentally whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 255. Only "*genuine* issue[s] of *material* fact" matter; only "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 247–48 (emphasis in original).

The parties who move for summary judgment, here the defendants, bear the initial burden of "informing the district court of the basis for its motion." *Celotex*, 477 U.S. at 323. They must then show "there is an absence of evidence to support the nonmoving party's case."

---

[7] Rule 56 was amended, effective December 1, 2010; however, it is appropriate to rely on cases decided before the amendment took effect, as "[t]he standard for granting summary judgment remains unchanged." Fed. R. Civ. P. 56, Notes of Advisory Comm. on 2010 amendments.

1  *Id.* at 325.  Rule 56 does not require the defendants to negate Gonzalez's claims.  *Id.* at 323.  If
2  the defendants meet this burden, Gonzalez must then respond and show the case is in fact proper
3  for trial, that is, it must "establish that there is a genuine issue of material fact . . . ."  *Matsushita*
4  *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986).  Both parties must "cit[e] to
5  particular parts of materials in the record . . . ; or show[] that the materials cited do not establish
6  the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible
7  evidence to support the fact."  Fed. R. Civ. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586
8  ("[The nonmoving party] must do more than simply show that there is some metaphysical doubt
9  as to the material facts.").  Unsupported assertions are insufficient: the purpose of summary
10 judgment is "'to pierce the pleadings and to assess the proof.'"  *Matsushita*, 475 U.S. at 587,
11 (quoting Fed. R. Civ. P. 56(e) advisory committee note on 1963 amendments).  Finally, because
12 the defendants have moved for summary judgment, the court draws all inferences and views all
13 evidence in the light most favorable to Gonzalez.  *Matsushita*, 475 U.S. at 587–88; *Whitman v.*
14 *Mineta*, 541 F.3d 929, 931 (9th Cir. 2008).

IV.    TIMELINESS

     A.    Title VII

Title VII plaintiffs must timely file charges with the EEOC or an equivalent state agency.  *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1099 (9th Cir. 2002).  The DFEH is such an agency.  *Dornell v. City of San Mateo*, 19 F. Supp. 3d 900, 905 (N.D. Cal. 2013).  When a state agency may grant appropriate relief, and the complainant first files a charge with that state agency, Title VII requires a complainant file an administrative charge with the EEOC "within three hundred days after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1); *see also E.E.O.C. v. Dinuba Med. Clinic*, 222 F.3d 580, 585 (9th Cir. 2000) (summarizing the statute).  If a complainant has filed a charge with the state agency, the charge is not deemed to have been filed with the EEOC, however, until either (a) sixty days elapse, or (b) the state investigation is closed, whichever occurs first.  42 U.S.C. § 2000e-5(c); *Dinuba*, 222 F.3d at 585.

1     Here, Gonzalez filed a charge with both the EEOC and the DFEH on January 14,
2  2013, and the state closed its investigation the same day. Compl. ¶¶ 11–12, ECF No. 1. Her Title
3  VII charge was therefore filed on January 14, 2013. The date three hundred days before January
4  14, 2013, was March 20, 2012. Gonzalez contends three aspects of Prieto's harassment occurred
5  after March 20, 2012: (1) two comments about her weight loss and appearance, accompanied by
6  his leering looks; (2) reports of harassment from other women working in the Sheriff's
7  Department; and (3) Prieto's description of her lawsuit as "bullshit." Merits Opp'n at 3–4.
8  Everything else happened before March 20, 2012. *Id.* at 2–3.

9     The entire timeline of an allegedly hostile work environment may inform a single
10 Title VII claim, even if several entries on that timeline fall outside the applicable statutory
11 limitations period. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 120–21 (2002). To
12 decide whether a series of harassing acts was a single unlawful practice, a court considers
13 whether the acts were "'sufficiently severe or pervasive,' and whether the earlier and later events
14 amounted to 'the same type of employment actions, occurred relatively frequently, [or] were
15 perpetrated by the same managers.'" *Porter v. California Dep't of Corr.*, 419 F.3d 885, 893 (9th
16 Cir. 2005) (quoting *Morgan*, 536 U.S. at 116, 120). The harassing conduct need neither escalate
17 over time nor culminate in severity within the statutory period. *Id.* at 894 (citing *Morgan*, 536
18 U.S. at 117). But "discrete discriminatory acts" must remain out of consideration if time-barred,
19 even if "related to acts alleged in timely filed charges." *Id.* at 893 (citing *Morgan*, 536 U.S. at
20 113).

21    Although the Supreme Court suggested conduct may have been part of the same
22 practice if it "occurred relatively frequently," a single unlawful act may draw the entirety of the
23 allegedly wrongful conduct within the limitations period. *See Morgan*, 536 U.S. at 118 ("[I]t
24 does not matter whether nothing occurred within the intervening 301 days so long as each act is
25 part of the whole."). The Ninth Circuit recently confirmed this point. *See Maliniak v. City of*
26 *Tucson*, __ Fed. App'x __, 2015 WL 1568568, at *2 (9th Cir. Apr. 9, 2015) ("[I]t was not
27 unreasonable for a jury to conclude that the [one incident that occurred in the limitations period]
28 was related to the earlier . . . incidents, and that all incidents were therefore part of the same

11

actionable hostile work environment claim."). The incidents the *Morgan* Court described as having "occurred relatively frequently" had occurred about once every other month within the limitations period and somewhat less often before the limitations period. *See Morgan v. Nat'l R.R. Passenger Corp.*, 232 F.3d 1008, 1011–13 (9th Cir. 2000), *aff'd in relevant part,* 536 U.S. 101 (quoting the circuit court below).

The employer's intervention or other changes in circumstance may disrupt an otherwise continuing violation by rendering later acts not "part of the same hostile environment claim." *Morgan*, 536 U.S. at 118. Moving to a new job away from a harassing supervisor often disrupts a continuing practice of harassment. *See, e.g.*, *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 77–78 (2d Cir. 2010); *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 329–30 (5th Cir. 2009); *Holmes v. Utah, Dep't of Workforce Servs.*, 483 F.3d 1057, 1063–64 (10th Cir. 2007); *Fairley v. Potter*, No. 01-1363, 2003 WL 403361, at *10 (N.D. Cal. Feb. 13, 2003); *cf. Vickers v. Powell*, 493 F.3d 186, 199 (D.C. Cir. 2007) ("[W]e can easily imagine circumstances in which a change in managers might affect a hostile work environment claim."). In light of the court's duty to consider "all the circumstances" of the alleged harassment, *Morgan*, 536 U.S. at 116, it is also sensible to take into consideration whether an intervening action was "reasonably calculated to end the harassment."[8] *See, e.g.*, *Stewart*, 586 F.3d at 329–30; *cf. Swenson v. Potter*, 271 F.3d 1184, 1197 (9th Cir. 2001) ("Even assuming that the investigation was less than perfect, the [defendant] nevertheless took prompt action to remedy the situation.").

Here, although Gonzalez contends only a few incidents of harassment occurred within the limitations period, these few may anchor a continuing practice of harassment if each constituent event was part of the same practice. There can be no genuine dispute, however, that Prieto's conduct changed after the County's intervention in June and November 2010. The parties agree he never hugged, kissed, pinched, or touched Gonzalez after November 2010, and never again did he offer her professional advantage in return for sexual favors. Gonzalez made

---

[8] Normally this question arises as part of an employer's affirmative defense under *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).

1    two internal complaints in 2010, and the County's director of human resources addressed these

2    complaints to Prieto each time.  Moreover, the parties agree that after 2010, Gonzalez moved to a

3    new position outside of detectives, went back out on patrol, and saw Prieto less frequently.  These

4    facts show the pre-2012 conduct was not part of the same continuing practice as the post-2012

5    conduct.

6             After March 2012, within the limitations period, only a few allegations remain.  In

7    her deposition, Gonzalez testified as follows:

> Q. . . . [Y]ou allege that the sheriff stared lewdly at you in 2012. When did that happen?
>
> A. During a briefing I had come in—or it was either a briefing or there was quite a few people in there. . . . I was standing behind a patrol desk.
>
> And he walked in and he looked me up and down a couple times and commented about my weight again, asked me how much I've lost, I look great, which would have been not as bad, but the way he was looking at me was like I had no clothes on.

Gonzalez Dep. 117:10–22.  And in a declaration, submitted with her opposition to the pending motion, she writes,

> At a deputy briefing session, Sheriff Prieto told me that I looked good and that I had lost weight. He stared at my body in a sexual manner. [On another occasion in September 2012], at a luncheon, Sheriff Prieto again made comments about my weight and said I looked great.  He looked me up and down and stared at my chest and hips in a sexual manner.

Gonzalez Decl. ¶ 22, ECF No. 38-2.

         Even when construed in the light most favorable to Gonzalez, these accounts describe no objectively sexual color in Prieto's behavior. *See Minor v. Ivy Tech State Coll.*, 174 F.3d 855, 858 (7th Cir. 1999)) ("This is not to deny the importance of context, which can include 'gesture, inflection, the physical propinquity of speaker and hearer, [and] the presence or absence of other persons,'" all "objective characteristics of an interaction." (quoting *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431 (7th Cir. 1995)).  Title VII is not a general code of American civility.  *See Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81 (1998).  It requires the defendant's conduct be "sufficiently severe or pervasive 'to alter the conditions of [the victim's]

13

1    employment and create an abusive working environment.'" *Meritor Sav. Bank, FSB v. Vinson*,
2    477 U.S. 57, 67 (1986) (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982))
3    (alterations in *Meritor*). The standard is objective, one of a "reasonable woman." *Ellison v.*
4    *Brady*, 924 F.2d 872, 879 (9th Cir. 1991). "Conduct that is not severe or pervasive enough to
5    create an objectively hostile or abusive work environment—an environment that a reasonable
6    person would find hostile or abusive—is beyond Title VII's purview." *Harris v. Forklift Sys.,*
7    *Inc.*, 510 U.S. 17, 21 (1993).

8            In 2012, Prieto's conduct included looking Gonzalez "up and down a couple
9    times" on only two occasions, both in public when many other people were present. He
10   commended her for losing weight, asked her how much weight she had lost, and told her she
11   "looked great." From Gonzalez's perspective, he looked at her "like [she] had no clothes on" and
12   "stared at [her] chest and hips in a sexual manner." Frequent lewd staring that persists after
13   reprimand may form the basis of a Title VII claim, but this is not such a case. *Cf., e.g.*, *Billings v.*
14   *Town of Grafton*, 515 F.3d 39, 50 (1st Cir. 2008) ("[T]he evidence depicts a supervisor who
15   regularly stared at [the plaintiff's] breasts for much of the two and a half years they worked
16   together. Thus, the alleged harassment did not consist merely of the sort of 'isolated incidents'
17   that ordinarily 'will not amount to discriminatory changes in the terms and conditions of
18   employment.'" (quoting *Faragher*, 524 U.S. at 788)); *Schindler v. Big Bear Airport Dist.*, No. 04-
19   04571, 2005 WL 5862851, at *3 (C.D. Cal. Jan. 4, 2005) (denying a motion to dismiss a
20   California-law claim of sexual harassment because the plaintiff alleged a supervisor "stared at her
21   several times a day . . . over a long period of time: over two years"); *but see, e.g.*, *Garriga v.*
22   *Novo Nordisk Inc.*, 390 F. App'x 952, 953 (11th Cir. 2010) (affirming summary judgment in the
23   defendant's favor for conduct that included "constant[]" leering at the plaintiff, even after she
24   asked him to stop); *Harris v. Harley-Davidson Motor Co. Operations*, No. 09-1449, 2011 WL
25   6003191, at *8 (M.D. Pa. Sept. 28, 2011), *rep. & recomm. adopted*, 2011 WL 5999601 (Nov. 30,
26   2011) (collecting cases to show staring and leering often fail to support Title VII claims).

27           Gonzalez describes no objective basis for her belief that Prieto's looks were
28   sexual, let alone enough to create a "hostile or abusive" employment environment. Tellingly,

14

Gonzalez has not provided the testimony of any witness who also believed Prieto's glances were overtly sexual or inappropriate. The other two alleged post-2012 acts — Prieto's calling her lawsuit "bullshit" and Gonzalez's hearing from coworkers that they had experienced or heard of Prieto's sexual harassment — are discrete events not similar in type or degree to the harassment she alleges occurred in 2010 and earlier. Because Prieto's conduct after 2010 was substantially curbed and not objectively hostile or abusive, it cannot form the basis of a continuing violation of Title VII, and Gonzalez's 2012 charge was untimely. The motion is granted.

### B. FEHA

An employee seeking relief under the FEHA must file a verified complaint with the DFEH within one year of the last alleged unlawful practice. Cal. Gov't Code §§ 12960(b), (d). If the DFEH does not institute a civil action within 150 days, or if it elects not to bring an action, the employee may seek judicial relief. *Id.* § 12965(b); *Rojo v. Kliger*, 52 Cal. 3d 65, 83 (1990). The continuing violation doctrine also applies to the FEHA: "[A]n employer's persistent failure . . . to eliminate a hostile work environment . . . is a continuing violation if the employer's unlawful actions are (1) sufficiently similar in kind . . . ; (2) have occurred with reasonable frequency; (3) and have not acquired a degree of permanence." *Richards v. CH2M Hill, Inc.*, 26 Cal. 4th 798, 823 (2001) (citations omitted). "Permanence" is defined by an objective standard, that is, the employer's "statements and actions make clear to a reasonable employee that any further efforts at informal conciliation to obtain reasonable accommodation or end harassment will be futile." *Id.*

Gonzalez filed her DFEH charge on January 14, 2013, and so must allege unlawful conduct continuing through January 14, 2012. For reasons similar to those described above with respect to Gonzalez's Title VII claim, Prieto's compliments and stares cannot form the basis of a FEHA violation continuing into 2012. Moreover, her situation acquired an objective degree of permanence in 2010 after the county's HR director told her it could do no more, and she did not lodge any further complaints because "nothing [was] going to happen." UMF1 no. 26. Whether or not Yolo County in truth could do no more to help her, her situation nonetheless became objectively permanent. The motion is granted.

1    Because the court grants summary judgment based on untimeliness, it does not

2 reach the question of affirmative defenses under *Ellerth*, 524 U.S. at 765, *Faragher*, 524 U.S. at

3 807, or *State Department of Health Services v. Superior Court*, 31 Cal. 4th 1026, 1034 (2003).

4 Neither does the court address whether Prieto is the County's agent for purposes of Gonzalez's

5 claims.

6 V.    COWORKER TEASING

7    In her complaint Gonzalez asserts claims arising only out of Prieto's "unwanted

8 hugging, kissing, sexual touching, and sexual comments." Compl. ¶ 3, ECF No. 1. The

9 complaint describes her coworkers' teasing only as evidence of Prieto's harassment and the

10 county's awareness of it. *See id.* ¶ 19 (citing teasing as evidence "Gonzalez's peers and

11 supervisors were aware of Prieto's harassment of her"); *id.* ¶ 20 ("It became such common

12 knowledge that Prieto would hug and kiss Gonzalez that other deputies would warn her to go out

13 the back door when Prieto was approaching."); *id.* ¶ 27 ("[Her coworkers' taunts] are examples of

14 how widely known it was that the Sheriff had a sexual interest in Gonzalez."). In their motion,

15 the defendants infer from these pleadings that Gonzalez asserts an independent violation of Title

16 VII or the FEHA based on her coworkers' conduct. Merits Mem 17. At the hearing Ms.

17 Gonzalez's counsel agreed the complaint did not specifically allege a hostile work environment

18 claim based on her coworkers' teasing, but he argued she had submitted evidence supporting such

19 a claim.

20    To the extent Gonzalez's complaint does allege her coworkers created a hostile

21 work environment, summary judgment must be granted. Coworker teasing is not normally

22 sufficient to state a claim for a hostile work environment under Title VII. *See Zetwick v. Cnty. of*

23 *Yolo*, 66 F. Supp. 3d 1274, 1286 (E.D. Cal. 2014) (citing *Ostin v. Gaet Gourmet, Inc.*, No. 01-

24 466, 2001 WL 34039106 (D. Or. Nov. 30, 2001) ("[O]ccasional vulgar banter, tinged with sexual

25 innuendo, of coarse or boorish workers, will not support liability under Title VII." (internal

26 quotation marks and citations omitted)). *See also Faragher*, 524 U.S. at 788 ("[S]imple teasing,

27 offhand comments, and isolated incidents (unless extremely serious) will not amount to

28 discriminatory changes in the 'terms and conditions of employment.'" (citations and internal

quotation marks omitted)). The same is true for the FEHA. *See Zetwick*, 66 F. Supp. 3d at 1286; *Doe v. City & Cnty. of San Francisco*, 835 F. Supp. 2d 762, 771 (N.D. Cal. 2011) (citing *Etter v. Veriflo Corp.*, 67 Cal. App. 4th 457, 465 (1998)). More importantly, the parties agree co-worker teasing ceased in 2010. UMF1 no. 57. Because the teasing occurred before 2012, and because it did not create a hostile work environment, it cannot form the basis of a claim under Title VII or the FEHA.

VI.   RETALIATION

The complaint omits an express claim for retaliation. In opposition to the current motion, however, plaintiff contends the evidence here would support such a claim under both Title VII and California law. *See* Merits Opp'n 13–15.

A.   Title VII

Under Title VII, an employer may not discriminate against any employee for "oppos[ing] any practice made an unlawful employment practice by this subchapter, or because he has . . . participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C § 2000e-3(a). The elements of a prima facie case of retaliation under Title VII are well-settled: a plaintiff must show (1) the employee engaged in a protected activity, (2) the employer subjected the employee to an adverse action, and (3) a causal link exists between the protected activity and the employer's action. *See, e.g., Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1034–35 (9th Cir. 2006). "[A] plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, __ U.S. __, 133 S. Ct. 2517, 2534 (2013). The "requisite degree of proof" in Title VII cases "is minimal and does not even need to rise to the level of a preponderance of the evidence." *Rashdan v. Geissberger*, 764 F.3d 1179, 1183 (9th Cir. 2014) (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)).

Gonzalez has not introduced evidence of any adverse employment action in retaliation for her complaint. She has suggested only that Prieto retaliated against her in 2012 by calling the claims against him "bullshit," that she was not invited to a volunteer honor guard

17

event, and that she did not receive overtime pay (rather than vacation time) for attending another honor guard event. An employer does not retaliate by making dismissive comments about an employee's claim. *See Hardage*, 427 F.3d at 1189 (collecting cases to show derisive comments, hostile stares, badmouthing, and ostracism in the workplace cannot form the basis of a retaliation claim unless they would "deter reasonable employees from complaining about Title VII violations"). The volunteer honor guard events in question were only two, compared to many in which she participated. Gonzalez has missed honor guard events both in the past and again since the events in question, and she agrees neither Prieto nor his daughter requested her absence. UMF1 nos. 62–64.

### B. FEHA

The FEHA provides, "It is an unlawful employment practice . . . [f]or any employer . . . to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." Cal. Gov't Code § 12940(h). The California Supreme Court interprets the FEHA largely as federal courts interpret Title VII's analogous provisions. *See Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005) ("[T]o establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action."). The definition of "adverse action," however, is articulated in different terms: "The proper standard for defining an adverse employment action is the 'materiality' test, a standard that requires an employer's adverse action to materially affect the terms and conditions of employment . . . ." *Id.* at 1036. Gonzalez's allegations and evidence cannot establish a triable issue of fact as to any retaliation against her. The parties agree the terms and conditions of her employment remained unchanged after she reported Prieto's comments and actions. UMF1 no. 30. The completely unchanged conditions of Gonzalez's employment by definition show she suffered no adverse action.

VII.   FAILURE TO PREVENT HARASSMENT UNDER THE FEHA

Because the court grants the motion for summary judgment on Gonzalez's FEHA claims, the defendants cannot be liable for failures to prevent harassment, and summary judgment must be granted.

VIII.   JUDICIAL ESTOPPEL

Because the court grants the County's substantive motion for summary judgment, the County's motion based on judicial estoppel is denied as moot.

IX.   CONCLUSION

This order resolves ECF Nos. 36 and 37.  Defendants' motion for summary judgment on the merits is GRANTED, and the companion motion on the basis of judicial estoppel is DENIED as MOOT.  Case closed.

IT IS SO ORDERED.

DATED: July 17, 2015.

_____
UNITED STATES DISTRICT JUDGE